# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MUMTAZ KUTTY,<br>    *Plaintiff,*<br><br>  v.<br><br>SAP AMERICA, INC., et al.,<br>    *Defendants.* | CIVIL ACTION<br>NO. 19-5251 |

**PAPPERT, J.**                          February 10, 2020

## MEMORANDUM

Mumtaz Kutty filed this lawsuit in the Northern District of California against Defendants SAP America, Inc., John Insley and John Does one through seventy after she was fired just before a deal on one of her accounts closed. She claims that Defendants breached an agreement that entitled her to receive commissions for her work on the deal and discriminated against her on account of her sex, national origin and association with a disabled person. On SAP's motion, the case was transferred here. SAP moves to dismiss Counts 1-4 and 18-22 of Kutty's Complaint and Insley moves to dismiss all claims against him (Counts 3-4 and 18-22). The Court grants Defendants' motions.

I

SAP hired Kutty, an Indian woman, as a Senior Solution Sales Executive in the Digital Supply Chain Division in March 2016.[1] (Compl,, ECF No 1., ¶ 10.) Kutty was "given a portion of a mediocre 'book of business'" with "minimal revenue pipeline," but met "approximately three quarters of her 2016 annual quota before" the year ended.

---

[1]   Kutty had also worked for SAP from 1998 to 2006. (*Compl.* ¶ 10.)

1

(*Id.* at ¶ 11.)  At the time, she worked alongside Insley (*id.*), but after a promotion he became her direct supervisor in early 2017.  (*Id.* at ¶ 12.)

Insley began to treat Kutty differently from his other direct reports who were all Caucasian males.  (*Id.* at ¶ 13.)  Although he "often" discussed performance issues with her Caucasian male peers, Insley never directly raised alleged performance issues with Kutty before reporting them to Human Resources.  (*Id.*)  In mid-2017, Insley gave some of Kutty's accounts to a Caucasian male co-worker, including accounts for which she "had created a substantial new business pipeline."  (*Id.* at ¶ 15.)  Soon after he transferred these accounts, Insley put Kutty on a performance improvement plan ("PIP") based on her alleged failure to demonstrate "steady streams of revenue each quarter."  (*Id.* ¶ 16.)  In the PIP, Insley accused Kutty of creating challenges with an account that were instead due to Insley's decision to use an "inadequate consulting partner."  (*Id.*)  Insley also accused her of unprofessionally managing a meeting that a Caucasian male had been asked to manage.  (*Id.*)  Kutty increased client meetings and mapped out business plans and revenue forecasts in compliance with the PIP's requirements.  (*Id.* at ¶ 17.)  At a Digital Supply Chain Division quarterly meeting that included Insley, Kutty reported on an Intel account with "a large deal that was on track to close before the end of calendar year 2017."  (*Id.*)  Soon after the meeting, Insley informed her that "her PIP was actually just an informal review" and "put her on another PIP" and said "she could no longer include Intel in her revenue forecasts because it was already a 'done deal.'"  (*Id.* at ¶ 18.)  Kutty "specifically asked for reassurance that she would be paid the commission she was so close to earning on the Intel account, and Insley assured her that she would be."  (*Id.*)  Thereafter, Kutty

"continued to meet or exceed her PIP goals, including initiating and closing a brand-new account in November 2017." (*Id.* ¶ 19.) Her "sales performance exceeded that of her Caucasian male peers." (*Id.*)

Insley fired Kutty on December 12, 2017. (*Id.* ¶ 20.) On December 27, the "Intel deal closed and SAP received approximately $11 million in revenue . . . ." (*Id.* at ¶ 21.) Kutty received no commission. (*Id.*) She contends she "should have earned over $200,000 for her work" under SAP's commission plan and that her Caucasian male coworkers may have been given commissions that she earned. (*Id.*) After her termination, her "accounts were given to one or more of her Caucasian male coworkers even though he/they were less experienced and less qualified to manage the accounts." (*Id.*)

In its decision to transfer this case, the Northern District of California determined that when Kutty completed her onboarding paperwork, she acknowledged and agreed to be bound by SAP's Global Incentive Plan for Revenue Generating Roles, Terms and Conditions ("GIP").[2] (Transfer Op., ECF No. 30 at 7 (finding "evidence sufficient to demonstrate the existence of an enforceable agreement").) Kutty "accepted the GIP in both 2016 and 2017." (*Id.* at 2.) "The GIP is a contract between SAP and eligible salespersons that governs a salesperson's commissions." (*Id.*) It addresses the

---

[2] In her responses to Defendants' motions, Kutty contends that the Court should not consider the GIP. (Pl.'s Opp'n to SAP Mot., ECF No. 21, at 3-4.; Pl.'s Opp'n to Insley Mot., ECF No. 22, at 2-4.) However, in deciding Defendants' motions to dismiss the Court may consider "any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'" *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004) (internal quotation marks and citations omitted)); *see also McTernan v. City of York, Penn.*, 577 F.3d 521, 526 (3d Cir. 2009) ("a court may take judicial notice of a prior judicial opinion"). Because the GIP appears in the record of the case and is integral to Kutty's claims, the Court takes judicial notice of its terms.

3

payment of commission to "employees who leave during the plan year, either voluntarily or involuntarily . . . ." (2017 GIP, Ex. A to SAP Mot. to Dismiss, ECF No. 8-1, at ¶ 3.7.) In relevant part, the 2017 GIP provides that Plan Participants

> who leave during the Plan Year . . . involuntarily . . . will be paid on deals booked and recognized prior to the date of termination to the extent incentives are earned on such deals. If a deal is not recognized prior to the termination date the employee is not eligible for any payment.

(*Id.*) It also provides that "[a]ll deviations from the incentive plan framework must follow the Variable Pay Governance/Exception process, which requires a written justification from the sponsoring executive in the business, a recommendation by the responsible HR Business Partner and a final approval by the Global Compensation Committee." (*Id.* at § 6.)

II

To survive Defendants' Rule 12(b)(6) motions to dismiss, Kutty must plead factual allegations that "raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The "mere possibility of misconduct" is not enough. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Her Complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678 (quotation and citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court need not give credence to "legal conclusions" couched as facts. *Id.* Kutty's "obligation to provide the grounds of h[er] entitlement to relief requires more than labels and conclusions . . . a formulaic recitation of the elements of a cause of action will

4

not do." *Twombly*, 550 U.S. at 555. If the well-pleaded facts do not nudge the "claims across the line from conceivable to plausible," the Court must dismiss Kutty's Complaint. *Id.* at 570.

III

Given the case's transfer from the Northern District of California, the Court begins by identifying the applicable law. The GIP provides that it is to "be construed, administered and enforced according to applicable Federal law and the laws of the Commonwealth of Pennsylvania without regard to its conflict of law rules." (GIP Addendum for U.S. and Canada, ECF No. 8-1, at ¶ 8.) Thus, although the parties' briefs apply California law to Kutty's breach of contract claims, the choice of law provision requires the Court to apply Pennsylvania law to claims concerning the compensation plan. *See Kruzits v. Okuma Mach. Tool, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994) ("Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them.").

To the extent that there are relevant differences between the laws of Pennsylvania and California, Kutty's other state law claims are governed by California law. *See Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964) ("[T]he transferee district court must . . . apply the state law that would have been applied if there had been no change of venue. A change of venue under § 1404(a) generally should be, with respect to state law, but a change of courtrooms."); *cf. Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007) ("If two jurisdictions' laws are the same, then there is no conflict at all, and a choice of law analysis is unnecessary.").

Kutty's transferred federal claims are governed by federal law as interpreted by

the Third Circuit. *See In re Korean Air Lines Disaster of September 1, 1983*, 829 F.2d 1171, 1176 (D.C. Cir. 1987) ("Binding precedent [for federal courts] is set only by the Supreme Court, and for the district courts within a circuit, only by the court of appeals for that circuit.").

IV

A

SAP argues that the GIP controls any commission payment to Kutty and, because the GIP explicitly states that she would not be paid any commissions if her employment terminated prior to a deal's close, her breach of contract claim (Count 1) cannot proceed. (SAP Mot., ECF No. 8, at 5-7.) Kutty responds that her claim rests on Insley's oral agreement to pay her commissions on the Intel deal and that, even if there is a written agreement relating to her commission compensation[3], any such agreement was modified by Insley's oral agreement. (Pl.'s Resp to SAP., ECF No. 21, at 5-7.) SAP replies that Kutty's reliance on any alleged assurances by Insley is barred by the GIP which "did not allow oral amendments or oral side agreements by first-level managers with respect to SAP's payment of commissions." (SAP Reply, ECF No. 24, at 2.)

In Pennsylvania, "[w]hen the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself." *Insurance*

---

[3] Kutty argues that she did not reference the GIP in her Complaint and that "she has no recollection of ever seeing the GIP during her employment, much less agreeing to its terms." (Pl.'s Opp'n to SAP Mot. at 6.) However, the Northern District of California found that Kutty accepted the compensation plan and its associated terms and conditions. (Transfer Op., ECF No. 30 at 7 ("Plaintiff would have been required to click the 'accept' button in order to create a digital record of acceptance as presented.").) The Court is not required to convert Defendants' motions into summary judgment motions in order to consider the GIP's terms, which are integral to Plaintiff's breach of contract claim. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) ("document[s] integral to . . . the complaint may be considered without converting the motion to dismiss into one for summary judgment" (internal quotation marks, citations and emphasis omitted)).

6

*Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468-69 (Pa. 2006) (citations omitted). The GIP's terms are unambiguous. SAP would not pay Kutty any commissions on a deal that was not recognized before she was fired. (GIP at § 3.7 ("If a deal is not recognized prior to the termination date the employee is not eligible for any payment.").) Kutty alleges that the Intel deal closed after she was fired. (Compl. ¶ 21.) She does not allege that the deal was recognized before her termination. Insley could not change the terms of Kutty's incentive plan to permit a commission payment after her termination without following SAP's Variable Pay Governance/Exception process. (GIP at § 6.) Kutty has not alleged Insley engaged in this process so, to the extent the written contract controls, she has not sufficiently alleged a claim for breach of contract.

Neither has she sufficiently alleged an oral modification to the written agreement. As the party relying on the alleged oral contract, Kutty has the burden of proving its existence. *See Edmondson v. Zetusky*, 674 A.2d 760, 764 (Pa. Commw. Ct. 1996). Under Pennsylvania law, a written contract that is not for the sale of goods may be modified orally, even when the written contract provides that modifications may only be made in writing. *See Somerset Cmty. Hosp. v. Allan B. Mitchell & Assocs., Inc.*, 685 A.2d 141, 146 (Pa. Super. Ct. 1996). However, to find that an oral modification exists, the parties' conduct must "clearly show[ ] the intent to waive the requirement that the amendments be made in writing." *Id.* Kutty's allegations are insufficient to establish that SAP intended to waive the requirements of the Variable Pay Governance/Exception Process set forth in the GIP, including the requirement that the sponsoring executive make "a written business justification" before final approval by the Global Compensation Committee. (GIP at § 6.) She alleges only that Insley

"assured her" that she would be paid the commission she was so close to earning on the Intel Account" and that he "promised [her] that she would be paid commissions for her work on the Intel account." (Compl. ¶¶ 18, 24.)

B

Kutty asserts a claim for bad faith breach of contract in Count 2, relying on the same alleged acts that underlie her breach of contract claim. She contends that Defendants engaged in bad faith by firing her two weeks before commissions were due for the Intel deal and by interfering with her right to receive the benefit of Insley's promise that she would be paid commissions for her work on the account. (Compl. ¶ 30-34.) She alleges Defendants made sure she was terminated prior to the closing of the Intel deal "for the purpose of denying [her] the commissions owed." (Compl. ¶ 32.)

"In the context of employment contracts, Pennsylvania law does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing which is separate from a breach of contract action."[4] *McGrenaghan v. St. Denis Sch.*, 979 F. Supp. 323, 328 (E.D. Pa. 1997). Because Kutty has not sufficiently alleged that SAP owed her any contractual obligations beyond those set forth in the GIP, her claim for bad faith breach of contract is subsumed by her breach of contract claim. Indeed, she concedes that she "will not recover any excess award for proving a bad faith breach of contract over and above what she will recover for proving a breach of contract." (Pl.'s Opp'n to SAP Mot. at 8.) Absent allegations sufficient to plead an obligation beyond the

---

[4] The same would be true under California law: any alleged breach of the implied covenant of good faith and fair dealing in an employment contract only gives rise to contract damages. *See Guz v. Bechtel Nat. Inc.*, 8 P.3d 1089, 1112 (Cal. 2000) ("[T]he remedy for breach of an employment agreement, including the covenant of good faith and fair dealing implied by law therein, is *solely contractual*.")

8

terms of Kutty's written agreement with SAP, Count 2 cannot withstand dismissal. *See Neff v. PKS Holdings, LLC*, No. 18-1826, 2019 WL 3729568, at *13 (E.D. Pa. Aug. 8, 2019) (dismissing claim for breach of the implied covenant of good faith and fair dealing where the plaintiff "fail[ed] to point to a contractual term that existed beyond the at-will employment relationship"); *see also Donahue v. Fed. Exp. Corp.*, 753 A.2d 238, 242 (Pa. Super. Ct. 2000) ("[T]he duty of good faith and fair dealing applies to those contractual terms that exist *beyond* the at-will employment relationship." (emphasis added)).

C

In Count 3, Kutty asserts a claim for an intentional misrepresentation by making promises without intent to perform; i.e., a claim for promissory fraud or fraudulent misrepresentation. *See Youe-Kong Shue v. Optimer Pharm., Inc.*, No. 16-2566, 2017 WL 3316259, at *8 (S.D. Cal. Aug. 1, 2017) ("'A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud.'") (quoting *Lazar v. Superior Court*, 909 P.2d 981, 985 (Cal. 1996)). To prevail, she must sufficiently allege "(a) misrepresentation . . . ; (b) knowledge of falsity . . . ; (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Lazar*, 909 P.2d at 984; *see also Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126 (9th Cir. 2009). Although "intent, knowledge and other conditions of a person's mind may be alleged generally," Kutty "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). She "must allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation," and

9

her Complaint must allege sufficiently particular facts to provide Defendants with notice of their alleged misconduct. *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 778 (3d Cir. 2018).

Kutty claims that SAP, by and through Insley, promised "that she would be paid commissions for work on the Intel account" during an August 2017 meeting and then again during an October 2017 meeting. (Compl. ¶ 36-37.) Kutty asserts that Defendants did not intend to keep the promises to pay the commission at the time they were made and that the promises were made "for the purpose of inducing [her] to rely upon them and to remain employed at SAP and continue working on the Intel account . . . ." (*Id.* ¶ 38-39.) Even if Kutty has sufficiently alleged that Insley promised her she would receive commission on the Intel deal and Defendants did not intend to keep the promise, dismissal of this claim is warranted because her Complaint does not allege a basis for "justifiable reliance" on the promise with the particularity required for Rule 9(b).

To plead justifiable reliance, Kutty must allege that she "actually relied on" Defendants' misrepresentations and that she was "reasonable in doing so." *OCM Principal Opportunities Fund, L.P. v. CIBC World Mkts. Corp.*, 68 Cal. Rptr. 3d 828, 855 (Cal. Ct. App. 2007), as modified (Dec. 26, 2007). Kutty makes only a conclusory allegation that she "acted in justifiable reliance on Defendants' promises by, among other things, continuing to work on the Intel account, remaining employed at SAP and forbearing the possibility of employment elsewhere." (*Id.* ¶ 40.) She offers no factual allegations to show that Insley had authority to promise that she would be paid the Intel commission. Absent further allegations, her alleged reliance on Insley's promise

10

is not plausible, especially in view of the GIP's requirement that any alterations to the commission plan would be made via the Variable Pay Governance/Exception process.[5] *Cf. Swafford v. International Bus. Mach. Corp.*, 383 F. Supp. 3d 916, 929 (N.D. Cal. 2019) (finding the plaintiff sufficiently alleged reasonable reliance on representations regarding commission payments where there was a written commission plan, but the plaintiff alleged that the plan explicitly stated that it was not an enforceable contract).

D

In Count 4, Kutty asserts a claim for negligent misrepresentation based on Insley's alleged promises that she would be paid commissions for her work on the Intel account. Plaintiff contends that "Insley's misrepresentation was that there was an agreement *at that time* to pay Dr. Kutty the Intel commissions." (Pl.'s Opp'n to SAP Mot. at 11.) SAP responds that Kutty's "argument falls flat given that she admits that the [Intel] deal was still speculative in August and October 2017 when Insley made the alleged misrepresentation." (SAP Reply at 9.)

In California, "[a]lthough a false promise to perform in the future can support an intentional misrepresentation claim, it does not support a claim for negligent misrepresentation." *Vinson v. City of Los Angeles*, No. 14-4488, 2015 WL 12750271, at *15 (C.D. Cal. May 19, 2015) (quoting *Stockton Mortg., Inc. v. Tope*, 183 Cal. Rptr. 3d 186 (Cal. Ct. App. 2014)); *see also Tarmann v. State Farm Mut. Auto. Ins. Co.*, 2 Cal. Rptr. 2d 861, 863 (Cal. Ct. App. 1991) ("[A] negligent misrepresentation must ordinarily be as to past or existing material facts."). Insley's alleged representation concerning

---

[5] Kutty's contention that she reasonably relied on Insley's promises because she "did not know of the GIP, and does not recall ever agreeing to its terms" (Pl.'s Opp'n to SAP Mot. at 9) fails in view of the Northern District of California's holding that the GIP was an enforceable agreement. (Transfer Op., ECF No. 30 at 7.)

11

the payment of commissions that were contingent on the closing of a deal cannot be the basis for a claim of negligent misrepresentation.

E

In Counts 18 and 19, Kutty alleges that Insley harassed her "because of her gender and/or national origin and her association with a disabled person" "by making false accusations about her and accusing her of conduct which she did not engage in and set her up to appear that she was not performing when[,] in fact[,] she was . . . ." (Compl. ¶¶ 127, 131.) She asserts that Insley falsely criticized her to HR and wrote her up for conduct including performance that he knew to be false or for infractions that were not serious. (*Id.*) Kutty's allegations are not enough to state a claim for harassment or for a hostile work environment under either Title VII, 42 U.S.C. § 200(e), or under the California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12900, et seq.

To plead either claim, Kutty must allege facts sufficient to show: (1) she belongs to a protected class; (2) she was subjected to unwelcome harassment (both subjectively and objectively); (3) the harassment was based on her protected status; (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment by creating an intimidating, hostile, or offensive work environment, and (5) there is a basis for employer liability. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (Title VII); *Thompson v. City of Monrovia*, 112 Cal. Rptr. 3d 377, 390 (Cal. Ct. App. 2010) (FEHA).

To plead an "abusive work environment" under Title VII, the alleged environment must be objectively hostile or abusive, and Kutty must have perceived it

as such. *Walton v. Mental Health Ass'n. of Se. Pa.*, 168 F.3d 661, 667 (3d Cir. 1999). Title VII does not create a cause of action for "the ordinary tribulations of the workplace . . . ." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). The Court must consider all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys.*, Inc., 510 U.S. 17, 23 (1993). Similarly, harassing conduct under FEHA must be "sufficiently severe or pervasive to 'alter the conditions of [the victim's] employment and create an abusive work environment," and excludes conduct that is "occasional, isolated, sporadic, or trivial." *Fisher v. San Pedro Peninsula Hosp.*, 262 Cal. Rptr. 843, 852, 609 (Cal. Ct. App. 1989) (citations omitted). It takes place "outside the scope of necessary job performance," and is "presumably engaged in for personal gratification, because of meanness or bigotry, or for other personal motives." *Reno v. Baird*, 957 P.2d 1333 (Cal. Ct. App. 1998). Under FEHA, "[p]ersonnel-related decisions involving discipline, performance evaluations, compensation, or job assignments do not inherently constitute unlawful harassment." *Cofer v. Parker-Hannifin Corp.*, 194 F. Supp. 3d 1014, 1018 (C.D. Cal. 2016) (citation omitted). "However, even 'necessary' managerial actions, when undertaken in a demeaning manner, may constitute harassment under FEHA." *Dorame v. Sprint United Mgmt. Co.*, No. 17-1720, 2018 WL 1662523, at *4 (C.D. Cal. Apr. 4, 2018).

Kutty alleges Insley never came to her to discuss alleged performance concerns, which is something he did with his Caucasian male reports. (Compl. ¶¶ 13-14.) She contends he gave a portion of her accounts to her Caucasian male peer. (*Id.* ¶ 15.) She

alleges that he put her on a PIP based on her alleged failure to show steady streams of revenue each quarter. (*Id.* ¶ 16.) Kutty also alleges that Insley falsely accused her of sleeping during a client meeting and that he falsely accused her of creating challenges with an account and unprofessionally managing a meeting. (*Id.* ¶¶ 13, 16.) Her allegations do not show that Insley's actions were undertaken in a "demeaning" manner. And while they may be enough to state a claim for disparate treatment based on her gender,[6] they do not plausibly allege severe or pervasive harassment that led to a material change in the terms or conditions of her employment. *Cf. Ingram v. Vanguard Grp., Inc.*, No. 14-3674, 2015 WL 4394274, at *20 (E.D. Pa. July 17, 2015) (finding that specific allegations of an employer's discriminatory comments paired with ignored complaints and unwarranted worsening performance reviews plausibly alleged conduct that was sufficiently severe or pervasive to survive a motion to dismiss). Counts 18 and 19 of her Complaint are dismissed. Because she cannot assert a Title VII claim for individual liability against Insley, her Title VII harassment claim against him is dismissed with prejudice.[7] *See Emerson v. Thiel Coll.*, 296 F.3d 184, 190 (3d Cir. 2002) ("individual employees are not liable under Title VII").

F

Defendants also move to dismiss Count 20 of Kutty's Complaint, which asserts a claim for "Discharge in Violation of Public Policy." Kutty alleges that the discharge and discrimination alleged in her Complaint "violated the public policy of the State of

---

[6]    Kutty offers few, if any facts suggesting that the harassment she alleges was motivated by her national origin or her association with a person who is disabled.

[7]    FEHA provides an avenue for individual liability for harassment. *See* Cal. Gov't Code § 12940(j)(3).

14

California as stated in the California Fair Employment and Housing Act, EEO and California Constitution." (Compl. ¶ 137.) As pled, this cause of action is nearly identical to Counts 7, 10, 13 and 16 of Kutty's Complaint which all bear the same caption.[8] (See Compl. ¶¶ 63-67, 80-84, 97-101, 114-118, 134-138.)

Although Count 20 does not reference the term harassment, SAP argues that it is derivative of Kutty's Title VII and FEHA harassment claims and should be dismissed because her underlying harassment claims are not sufficiently pled. (SAP Mot. at 13.) Kutty does not dispute SAP's characterization of Count 20 as a derivative claim. Rather, she contends it is sound because there is a "fundamental public policy to provid[e] a safe workplace for people with many different protected statuses – including those at issue in this case – and . . . allegations of harassment and discrimination based on sex . . . support a claim of tortious discharge in contravention of public policy." (Pl.'s Opp'n to SAP Mot. at 14.)

To the extent that Count 20 is derivative of Kutty's harassment claims, it is dismissed because those claims are not sufficiently pled.[9]

---

[8] These Counts follow Kutty's claims for sex and/or national origin discrimination (Counts 5 and 6), sex discrimination (Counts 7 and 8), national origin discrimination (Counts 11 and 12) and associational disability discrimination (Counts 14 and 15). Defendants do not move to dismiss Counts 5 through 16.

[9] Insley argues that Count 20 of Kutty's Complaint against him should be dismissed because "[a] supervisor cannot be held personally liable under the FEHA or for discharge in violation of public policy for discrimination relating to personnel management decisions." (Insley Mot. at 11.) However, to the extent that this claim derives from Kutty's harassment claims, "FEHA specifically makes harassment by an employee unlawful." *Hall v. Kraft Heinz Food Co. (LLC)*, No. 19-565, 2019 WL 2598764, at *3 (E.D. Cal. June 25, 2019) (citing Cal. Gov't Code § 12940(j)(3)). Whether Plaintiff can directly assert any other claims against Insley pursuant to FEHA is a separate question not answered here.

G

Kutty has not sufficiently alleged an intentional infliction of emotional distress claim in Count 21 of her Complaint. To plead such a claim under California law, she must show "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard to the probability of causing, emotional distress; (2) [she] suffered severe or extreme emotional distress; and (3) [her] injuries were actually and proximately caused by the defendant's outrageous conduct." *Cochran v. Cochran*, 76 Cal. Rptr. 2d 540, 543 (Cal. Ct. App. 1998). To meet the first requirement, the alleged conduct "must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Id.* (citing Rest. 2d Torts, § 46 cmt. d).

That she was terminated is not enough to support her claim. "A simple pleading of personnel management activity is insufficient to support a claim of intentional infliction of emotional distress, even if improper motivation is alleged. If personnel management decisions are improperly motivated, the remedy is a suit against the employer for discrimination." *Janken v. GM Hughes Elecs.*, 53 Cal. Rptr. 2d 741, 756 (Cal. Ct. App. 1996). Nor is her allegation that Insley made a misleading promise pertaining to a commission payment sufficient to demonstrate extreme or outrageous conduct. *See Mocada v. West Coast Quartz Corp.*, 164 Cal Rptr. 3d 601-630-31 (Cal. Ct. App. 2013) (finding allegation of a "false promise to pay a retirement bonus" did "not reach the level of extreme and outrageous conduct that is necessary" to state a claim for intentional infliction of emotional distress).

H

Kutty does not oppose the motions to dismiss Count 22 of her Complaint: her

16

claim for intentional interference with contractual relations. (Pl.'s Opp'n to SAP Mot. at 15; Pl.'s Opp'n to Insley Mot. at 13.) Accordingly, Count 22 of Plaintiff's Complaint is dismissed.

## VI

Federal Rule of Civil Procedure 15(a)(2) states that the Court "should freely give leave [to amend] when justice so requires." "This certainly includes amendment to cure defective allegations." *Shifflett v. Korszniak*, 934 F.3d 356, 366 (3d Cir. 2019) (citing 6 Wright & Miller, Federal Practice and Procedure: Civil § 1474 (3d ed. 2019)). Kutty may amend Counts 1-4 and 18-21 against SAP and Counts 3-4 and 19-21 against Insley consistent with this Memorandum and to the extent she can allege facts sufficient to state a plausible claim for relief. Count 18 is dismissed with prejudice as against Insley.

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.